**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                            **Criminal Action No.: 1:18-CR-33**
                                       **JUDGE KEELEY**

**JAMES TIMOTHY COBB,**

        **Defendant.**

## REPORT AND RECOMMENDATION RECOMMENDING DEFENDANT'S MOTION TO SUPPRESS BE GRANTED IN PART AND DENIED IN PART

This matter is before the undersigned pursuant to a referral order (ECF No. 17) entered by Senior United States District Judge Irene M. Keeley on July 9, 2018. Defendant, appeared in person and by counsel, Richard Walker, Assistant Federal Public Defender, and the Government by and through Assistant United States Attorney, Sarah E. Wagner, in both the July 19 and 23, 2018 hearings. Upon consideration of the record and the evidence and arguments presented by both parties, the undersigned **RECOMMENDS** that the Motion to Suppress be **GRANTED** in regard to the September 23, 2014 search warrant (ECF No. 19-2) and **DENIED** in regard to September 16, 2014 search warrant (ECF No. 19-1), for the reasons presented below.

### I.      FACTUAL AND PROCEDURAL BACKGROUND

On September 7, 2014, an altercation between Defendant and Paul "Dean" Wilson occurred in the home of Defendant's parents, James Keith Cobb (hereinafter "Mr. Cobb") and Freda Cobb, where Defendant and Mr. Wilson both resided. The altercation led to the death of

Mr. Wilson by means of suffocation and Defendant was subsequently charged with second degree murder.

Following the arrest, Defendant was recorded during his jail calls requesting that Mr. Cobb place Defendant's personal computer in Mr. Cobb's room and have someone clean the computer off because he had information on the computer that he did not want anyone to see. Following this phone call, a search warrant for the seizure of the Gateway computer, in addition to the seizure of other items, was issued on September 16, 2014 (ECF No. 19-1). On September 23, 2014, a second search warrant was issued that permitted the search of the contents of the computer (ECF No. 19-2). At some point between the issuance between September 16 and September 23 search warrants, the State dismissed the second degree murder and recharged Defendant with first degree murder. Ultimately, Defendant entered into a plea agreement for his state murder charge, but was not indicted in the Northern District of West Virginia until May 1, 2018. (ECF No. 1).

On July 6, 2018, Defendant filed a *Motion to Suppress Physical Evidence* (ECF No. 16), requesting that the Court suppress the evidence found on Defendant's computer because the search warrant lacked probable cause and the <u>Leon</u> good-faith exception is inapplicable in this case. With the Government's permission, Defendant filed its *Supplemental Memorandum of Law in Support* on July 10, 2018 (ECF No. 18). In the Memorandum, Defendant argued that the search warrant did not meet the particularity requirements due to the fact that the warrant did not describe the files to be searched and the generalizing phrase negated any particularity that the warrant possessed.

On July 13, 2018, the Government filed a *Response to Defendant's Motion to Suppress Physical Evidence* (ECF No. 19). The Government argued that the phrase "any and all evidence

of any other crime" does not negate the particularity of the previous sentence. Furthermore, the warrant was based on probable cause and in the event the undersigned finds that there was no probable cause, the <u>Leon</u> good-faith exception saved an otherwise invalidated warrant.

On July 18, 2018, the Government filed a *Supplemental Response to Motion to Suppress Physical Evidence* (ECF No. 16), arguing that the testimony of former magistrate Cathy Reed-Vanata was irrelevant because the Motion hinges on the good-faith exception and her testimony was irrelevant. On July 18, 2018, the undersigned entered an Order finding that probable cause allows inquiry into what information was presented to the magistrate during the search warrant application and that her testimony is relevant and subsequently overruled the Government's objection to the presentation of former magistrate's testimony. (ECF No. 24).

### A.   The July 19, 2018 Motion Hearing

Kevin Alkire was an investigating officer for the Marion County Sheriff's Department during the time of the investigation into the death of Mr. Dean Wilson. (July 19 hearing, 11:12). Sgt. Alkire had twenty years of experience, which followed his thirteen week training at the West Virginia State Police Academy. <u>Id.</u> He testified regarding the following:

Sgt. Alkire went to the police station on September 8, 2014, and was informed of the altercation that occurred over the weekend. (11:13). The altercation was being investigated by Detective Williamson and Sgt. Alkire was to assist her in this investigation. <u>Id.</u> During this investigation, Sgt. Alkire testified that he went to the crime scene, completed search warrants, reviewed phone calls and conducted witness interviews. (11:14). There were two 911 recordings that Sgt. Alkire reviewed in his investigation. The first 911 call was made by Mr. Cobb and the altercation can be heard in the background. (11:49). Mr. Cobb stated that police assistance was necessary or "someone was going to get killed." (11:50). Mr. Cobb can also be heard saying "[Defendant's] going to kill you, Dean." (11:50). At some point on the recording, Sgt. Alkire

stated that Mr. Wilson could be heard saying "I did what I had to do." (11:51). The second 911 call was again placed by Mr. Cobb. Mr. Cobb requested that the police come to the home because his nephew is pinned to the ground and his son was holding his nephew down, and "if he gets up, I'm going to kill him." (11:52).

Sgt. Alkire also testified that there were jail calls that he listened to that were referenced in the search warrants. On September 9, 2014, Defendant was recorded speaking to his father. Defendant tells his father that his laptop is on his bed in his room and Mr. Wilson had previously used the computer and put some "shit" on it. (11:54). At this point, Defendant asks his father to take Defendant's computer and put it in his father's room "to keep it safe." Id. Defendant also requested that Mr. Cobb "wipe down" or "clean" the computer. Id. Another recorded jail called was made on September 16, 2014; Defendant was speaking to Mr. Cobb. Mr. Cobb told Defendant that the police had visited the home with a search warrant and that his computer was seized. (11:57). Defendant responded stating "Oh dad, oh oh, dad. Dean had my computer for two days." Id. A third recorded jail call was made on September 16, 2014; Defendant was speaking to his mother. (11:56). He was recorded saying "something else you learn the hard motherfucking way. Don't let anyone borrow your electronic equipment." Id. His mother responded stating "ain't that the truth." Id. Defendant stated "you're fucking A right. That's about the worst thing you can ever do. You know it's a motherfucker." (11:56).

During the investigation, Sgt. Alkire was told two different stories regarding why the altercation started. Ms. Cobb told the investigators that Mr. Wilson had punched her. During a recorded jail call, Ms. Cobb admitted to having done this and that her neighbor had told her to put a piece of cotton in her mouth to make it look like Mr. Wilson had hit her. (11:59). Mr. Cobb also stated that Mr. Wilson "went after" him. There was a third explanation that a missing or

misplaced Barretta that had been stuffed under the couch cushions. Sgt. Alkire stated he had no clear understanding of the reason behind the altercation.

On September 16, 2014, the first warrant was drafted by Detective Williamson and Sgt. Alkire was not present when it was presented to the magistrate. (11:16). He does not specifically recall having input in to the contents of the search warrant, but testified that he was probably involved in some form of discussion regarding what to put in the search warrant. (11:18). This search warrant application provided for several items located in Defendant's residence be seized, including, firearms, cellphones, and a laptop. (11:19). Sgt. Alkire testified that because the computer had been reference and there was potential material that Mr. Wilson had placed on the computer, in consideration with Defendant's request to "wipe it down," Sgt. Alkire wanted to look at the contents of the computer. Following the seizure of the computer, a second search was warrant drafted by Sgt. Alkire on September 23, 2014. (11:22). Sgt. Alkire presented the warrant himself to the magistrate, but did not communicate anything other than what was contained in the warrant to the magistrate. (11:35). Following the five minute meeting with the magistrate, the search warrant was issued. (11:24).

When discussing his previous experience, Sgt. Alkire testified that he had one class several years prior about handling electronic searches but stated he is not an expert in the subject. (11:27). Sgt. Alkire testified that this would be how he would articulate the request unless he knew more specific information. (11:28). Sgt. Alkire stated that he was taught to include the phrase "any and all evidence" at the end of the warrant, just in case something else is found. (July 19 hearing, 11:29). He also has included this phrase on approximately one hundred search warrants and no one has ever told him that he should not put this phrase in search warrants.

Sgt. Alkire stated that the computer was going to go to the crime lab, but the results would take months to be completed. (11:38). Sgt. Alkire said "they felt it was important enough to take a look at it" before the computer was sent to the lab. (11:39). As far as the information that Sgt. Alkire was seeking to retrieve from the computer, he testified that he wanted "to look at everything that is in there" that may be associated with the homicide and wanted to look at any other crimes that were evidenced in the contents of the computer. (11:33). He testified that the jail calls made him think *something* was on the computer, and could potentially be evidence that would explain the motive that would justify the premeditation requirement of Defendant's first degree murder charge. (11:38). As it stood, there were three different explanations behind the altercation provided to investigating officers. Sgt. Alkire testified that he wanted to look for photographs, files, searches about suffocation, and emails. (11:39). When questioned about why he thought to look in Defendant's pictures, Sgt. Alkire stated that he had no information about the potential for child pornography being stored on the computer. (11:41). He also stated that he had never performed a search of a computer prior to this.

Sgt. Alkire testified that once he began opening files, he came across photographs that he identified as child pornography. (11:37). At that time, he stopped the search and filled out a Case Submission Form 53, which was done on September 26, 2014. (11:43). This Form was submitted to the forensic lab and the contents of the computer were reviewed after several months. The case was eventually referred the U.S. Attorney's Office. Id.  Sgt. Alkire also testified that he was unsure of what he was going to find on the computer, that the warrant gives him a lot of latitude as far as the search, and that he did not know of any language or alterations to this warrant to make the scope more broad. (11:38). He also added that he has never had a warrant rejected.

### B.      The July 23, 2018 Motion Hearing[1]

On July 23, 2018, Cathy Reed-Vanata, the former magistrate who issued both search warrants, testified. (July 23 hearing, 9:04). She stated that she was not provided with any other information regarding the investigation that was not already contained in the four corners of the affidavit nor did she ask any questions because that was not the "appropriate practice." (9:05). When asked about the phrase "any and all evidence," Ms. Reed-Vanata stated that language was not new to her and had been proposed to her before in search warrants she had granted. (9:07). She also testified that there was no dispute that Mr. Wilson had died during or after the domestic dispute. (9:10). She also stated that she knew who the individuals involved in the altercation were, the location of the altercation, and that the altercation ended in a death. Id. She also testified that she was surprised that phone calls were made regarding cleaning his computer off because most people know that jail calls are recorded.

### C.      The Police Reports

The police reports detailed the investigation beginning with the night of the altercation until 2015. The following information was known to the police investigators at the time of the search of the contents of the computer.[2] The initial 911 call recorded the events of part of the altercation. (ECF No. 19-3, at 6). During the recording, Frieda Cobb can be heard saying "Tim he's helpless." Id. Mr. Cobb was then heard saying "Tim you're going to end up killing the man." Id. Wilson is not heard on the recording following these statements. Id. On September 9, 2014, Defendant was "heard advising his parents to have someone clean up his computer which he advised should be in his room and also when they come to the jail to get his cellular

---

[1]  Due to the schedule of former magistrate Cathy Reed-Vanata, her testimony was taken on July 23, 2018.
[2]  Some of this information was not testified to at the Motion hearing although it is part of the record. This information will be used during any good-faith analysis because these are uncontroverted facts known to the investigators at the time of the warrant.

telephone." Id. This telephone call was not discovered until September 15, 2014. Id. On September 11, 2014, "Mr. Cobb stated that the fight started because Paul Dean Wilson was threatening him and came after him. Mrs. Cobb stated that the fight started because Paul Dean Wilson was being mean to her cat and when she told him to stop being mean to the cat he punched her in the mouth." (ECF No. 19-3, at 7). On September 16, 2014, the first search warrant was executed. Id. On September 18, 2014, the charge against Defendant was changed to first degree murder "based on new information" that was learned after listening to the 911 calls. Id. at 8.

Investigators seized the computer on September 23, 2014, but could not access the computer because it was password protected. The computer was unlocked by Robb McIntyre who works on the department's computers. Id. at 19. "It only took him a few minutes to get past the password. A brief examination of the contents of the computer showed a quantity of stored pornographic photos of what appears to be underage females." Id. When interviewing Mr. and Mrs. Cobb, "[n]either one of them seemed shocked that there was pornographic images of underage females on their son's computer. They both immediately blamed Dean for the images being on there." Id. at 20.

## II.    ANALYSIS

### A.    Probable Cause

Defendant argues that there was no sufficient nexus between the criminal conduct and the computer and the search resulted from the investigators fixating on the conversations and the search warrants were not based on probable cause. (ECF No. 16, at 6).  The Government argues that the warrant was based on probable cause because the warrant included information about "when and where the altercation occurred, exactly how the altercation occurred, the identity of

the two eyewitnesses, as well as Mr. Cobb's jailhouse request to have information destroyed." (ECF No. 19, at 6).

For a search warrant to be valid, the Fourth Amendment requires that warrants be issued "upon probable cause, supported by oath or affirmation." U.S. CONST. AMEND. IV. To issue a search warrant, the issuing magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [them], . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238-9 (1983). This should be determined based on the totality of the circumstances. Id. What constitutes probable cause "is a reasonable ground for belief of guilt." Brinegar v. United States, 338 U.S. 160, 174 (1949). This "'means less than evidence which would justify condemnation' or conviction," but must be "more than bare suspicion." Id. at 175. "Although the concept of probable cause resists an exacting definition, it 'exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found' in a particular place." United States v. Perez, 393 F.3d 457, 461 (4th Cir. 2004). "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific "things" to be searched for and seized are located on the property to which entry is sought." United States v. Doyle, 650 F.3d 460, 471 (4th Cir. 2011) (quoting Zurcher v. Standford Daily, 436 U.S. 547, 556 (1978)).

The duty of the reviewing court, however, is to determine whether the "magistrate had a substantial basis for concluding that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238-39 (1983). When reviewing the magistrate's probable cause determination, the reviewing court "must accord 'great deference' to the magistrate's assessment of the facts presented to

[them]." United States v. Blackwood, 913 F.2d 129, 142 (4th Cir. 1990) (quoting Spinelli v.

United States, 393 U.S. 410 (1969)). Thus, the reviewing court will not review the probable

cause determination *de novo*.

**1. The first search warrant (ECF No. 19-1) issued to seize and hold the computer was based on probable cause.[3]**

The search warrant issued on September 16, 2014, requested the approval to seize:

Any and all firearms belonging to Paul Dean Wilson, Jr., any and all laptop computers, including tablets or desktop computers belonging to or operated by James Timothy Cobb, any and all cell phones belonging to or operated by James Timothy Cobb, and any and all evidence of a crime.

(ECF No. 19-1, at 1).

The search warrant also stated with regard to the factual basis the following:

The facts for such belief are On 09/07/14 at appox. 2355hrs. Deputies responded to an altercation at [redacted address]. Once on scene deputies advised that a male subject was unresponsive and started CPR. Once the undersigned arrived on scene the male subject, identified as Paul Dean Wilson Jr., was pronounced dead by EMTS. The undersigned then spoke with witnesses in the residence, James K. Cobb and Fred Cobb, who advised a physical altercation had taken place between James Timothy Cobb and his cousin Paul Dean Wilson Jr. During the altercation between James T. Cobb and Wilson, James T. Cobb placed Wilson in a choke hold and placed his knee on his chest and pulled his head towards his knee. When deputies arrived on scene James T. Cobb still had Wilson restrained and Wilson was unresponsive. On 09/09/14 statements were made by James Timothy Cobb requesting his parents, James Keith Cobb and Freda Cobb, have a subject clean off his laptop and pick up his cellular telephone from the jail. Also upon speaking with James K. Cobb he advised that Paul Dean Wilson Jr. had possession of a hand gun he called a "Berretta" and started the altercation over the firearm not being where Mr. Wilson left the gun. The above events occurred in Marion Co., WV.

(ECF No. 19-1, at 1, 3).

This warrant described the property to be seized, and included the description Gateway

Laptop with charger SN NXYIUAA0032251C66F1601. The statement of facts as for the basis

---

[3] The undersigned finds the need to discuss each warrant separately with regards to Defendant's contentions of the sufficiency of the warrant.

for the need for the warrant detailed that one phone call was made from Defendant in jail to his parents and Defendant requested that his father clean Defendant's computer.

The undersigned finds that this is sufficient probable cause at most to seize and hold in police custody the Gateway Computer that belonged to Defendant, but in no way finds this is sufficient to authorize the search of the computer's contents. A second search warrant would be required to search the contents of the computer. There were several other considerations that can be taken into account, including the need to rush due to Defendant's statements that led investigating officers to believe that there was evidence on that computer that may be erased or destroyed. This information was contained in the search warrant, which adequately described the item—the computer—to be seized. While Defendant argued that this warrant lacked probable cause, the undersigned finds that the issuing magistrate was correct in determining that the first warrant, allowing the seizure of the Gateway computer, was based on probable cause.

## 2. The second warrant was issued based on probable cause because there was sufficient information discovered during the investigation to establish probable cause.

In the second search warrant (ECF No. 19-2) was issued on September 23, 2014. The search warrant application requests a warrant for the search/seizure of "any material associated with the homicide of Paul Dean Wilson Jr. stored internally on a Gateway laptop computer serial #NXY1UAA0032251 dark gray in color belonging to or used by James Timothy Cobb. Any and all evidence of any other crimes." The warrant also stated that:

> The facts for such belief are On September 07, 2014 the Marion County Sheriff's Dept. responded to a domestic altercation between James Timothy Cobb and Paul Dean Wilson Jr. who are cousin both living with Cobb's parents at [redacted address] Fairmont in Marion Co. Wilson was pronounced dead at the scene. Cobb was arrested and charged with second degree murder. After new evidence was discover the second degree murder charge was dismissed and Cobb was Charged with first degree murder. During the investigation Cobb's phone calls from the jail have been

monitored. During one conversation Cobb was heard to tell his father to get the computer out of his room and put it in his father's room. He said there are some things on there that need to be cleaned before anyone sees them. On at least two other occasions he made reference to his parents about never letting anyone borrow your electronic equipment. On September 16, 2014 the Marion County Sheriff's Dept. served a search warrant on Cobb's residence at [redacted address] and seized the Gateway laptop computer referenced by James Timothy Cobb.

(ECF No. 19-2, at 1)

The search warrant contains two facts: 1) there was an altercation between two cousins, ending in the death of Mr. Wilson, and 2) Defendant asked his father to wipe his computer. The magistrate did not consider any other information outside of the warrant application.[4]

Sgt. Alkire, however, discovered during the initial stages of the investigation enough information that would have established probable cause. Sgt. Alkire testified to knowing at that time the search warrant issued: 1) that an altercation occurred between cousins; 2) Mr. Wilson died due to injuries sustained in said altercation; 3) Defendant was arrested and charged with second degree murder; 4) there were three different stories provided to investigators regarding the reason behind the altercation; 5) there were two recorded 911 calls, which were the reasons for dismissing his second degree murder charge and recharging Defendant with first degree murder; 6) jail calls were recorded of Defendant telling his parents that his cousin had used his computer for two days prior the altercation; 6) Defendant told his parents never to let anyone borrow their electronic devices; 7) Defendant told his father to move Defendant's computer to his father's room; 8) Defendant told his father to have someone clean off his computer before anyone saw what was on it; and 9) Mr. Wilson had allegedly been on Defendant's computer and

---

[4] During the July 19, 2018 Motion hearing, Sgt. Alkire testified that no other information was supplied to magistrate that was not contained in the warrant application. As such, the only information that should be considered in the determination of whether probable cause existed is the four corners of the affidavit.

put "shit" on it. All of this information is pertinent to the probable cause determination and particularly any <u>Leon</u> good-faith arguments.

Due to the proximity to the death of Mr. Wilson and subsequent arrest of Defendant that the discussion of the computer occurred, along with the nature of the request to "clean it up," the undersigned finds that there is enough information for the magistrate to have determined that there was probable cause to search the computer for evidence of the homicide.

## B. Particularity

Defendant's argument challenging the particularity of the warrants is two-fold. (ECF No. 18). First, Defendant argues that the warrants are invalid due to its overly broad nature because is no provision explaining what the investigators were looking for other than evidence associated with the homicide of Mr. Wilson. Second, Defendant argues that the phrase "any and all evidence of any other crimes," contained at the end of the warrant, renders the rest of the warrant overly broad. (ECF No. 18, at 5). The Government argued that this language "any and all evidence of any other crimes" is superfluous and does not affect the particularity of the warrant. (ECF No. 19, at 9). The Government does not provide argument in opposition for Defendant's argument regarding the particularity of the body of the first and second search warrants.

For a search warrant to be valid, it must "particularly describe[e] . . . the . . . things to be seized." U.S. CONST. AMEND. IV. For a warrant to not be considered "general," a warrant needs to be based in probable cause and "the scope of the authorized search is set out with particularity." <u>U.S. v. Galpin</u>, 720 F.3d 436 (2d Cir. 2013) (quoting <u>Kentucky v. King</u>, 131 S. Ct. 1849 (2011)). This particularity requirement necessitates more narrow searches and seizures to "minimize[] unwarranted intrusions upon privacy." <u>Andresen v. Maryland</u>, 427 U.S. 463, 482 n.11 (1976). The purpose of this particularity requirement is to provide perimeters to a search

13

that leaves "nothing . . . to the discretion of the office executing the warrant. <u>Galpin</u>, 720 F.3d at 446 (citing <u>Marron v. United States</u>, 375 U.S. 192 (1927)). This requirement prevents the abuse of general warrants that would permit "exploratory rummaging" through belongings in order to search for evidence of a crime. <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 467 (1971).

This requirement may be established by fulfilling two elements: 1) a description of the items to be seized with language that would identify to police officers which items are considered separate items from the search and which are relevant, and 2) the description cannot be so broad that the description includes items that should not be seized. <u>United States v. Upham</u>, 168 F.3d 532, 535 (1st Cir.1999). A "'fishing expedition' or 'a random exploratory search or intrusion' in violation of the 'particularity' requirement of the Fourth Amendment are disallowed." <u>United States v. Lynch</u>, 228 Fed. App'x 248 (4th Cir. 2007). The description, itself, should, thus, be limited to the items that should be searched or seized within the scope of probable cause that the warrant establishes. <u>In Re Grand Jury Investigation Concerning Solid State Devices</u>, 130 F.3d 853, 857 (9th Cir. 1997).

A search that results in the discovery of additional criminal behavior or charges does not automatically mean that a search is overbroad and that information cannot be seized. <u>United States v. Phillips</u>, 588 F.3d 218 (4th Cir. 2009). A warrant, however, is not a "constitutional strait jacket" and reviewing courts must heed to a "common sense and realistic" approach to reviewing the sufficiency of a warrant. <u>Phillips</u>, 588 F.3d at 223. The "courts may tolerate some ambiguity in the warrant so long as 'law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant.'" <u>Galpin</u>, 720 F.3d at 446 (quoting <u>United States v. Young</u>, 745 F.2d 733, 759 (2d.

Cir. 1984)). Moreover, a warrant does not need to "scrupulously list and delineate each and every item to be seized," particularly in complex criminal schemes, such as interwoven frauds scheme, when particularity of every item would be near impossible. Phillips, 588 F.3d at 225. However, the limitation of authorization ensures "the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." Maryland v. Garrison, 480 U.S. 79, 84 (1987).

A search, which is conducted by and through a warrant, is limited to the scope of the authorization provided by the warrant. Phillips, 588 F.3d at 218. Courts have held that the contents of a search warrant should differ depending on whether the computer is contraband or an instrumentality of a crime, *or* whether the probable cause relates only to the information that is contained in the computer. Davis v. Gracey, 111 F.3d 1472, 1480 (10th Cir. 1997). Generally, when the contents of the computer are to be searched because the computer contains evidence of a crime, the list of items on the computer to be searched for and seized should detail the content on the computer rather than the actual physical description of the physical storage media. Searching and Seizing Computers and Obtaining Evidence in Criminal Investigations, Computer Crime and Intellectual Property Section, Criminal Division, U.S. Dep't of Justice (3d. ed. 2009). The Department of Justice recommends that the search warrant begins with an "all records" description; add limiting language stating the crime, the suspects, and relevant time period, if applicable; include explicitly examples of the records to be seized; and indicate that the records may be seized in any form, whether electronic or non-electronic." Id.

### 1. The first warrant was sufficiently particular.

The first search warrant (ECF No. 19-1) issued described the computer as a Gateway Laptop with charger SN NXYIUAA0032251C66F1601 and the address of the residence in which

the computer should be found. This is sufficiently particular to describe the computer and charger that was to be seized from the residence. The undersigned finds that the first warrant was sufficiently particular to seize the computer.

> **2. The second warrant is so lacking in particularity that this warrant constitutes a general warrant that allows for the unlimited and unchecked "exploratory rummaging" into the entirety of Defendant's private life.**

Defendant argues that the second search warrant (ECF No. 19-2) provides no limitations except to limit the warrant to "any material associated with the Homicide of Paul Dean Wilson, Jr" and the warrant did not state for what the investigating officers were specifically looking. (ECF No. 19-1, at 1).

The Government provides no argument as to why the warrant is sufficiently particular when it allows a search of every part of the computer to find any information "associated" with the homicide of Mr. Wilson. The undersigned is persuaded by Defendant's argument surrounding the lack of particularity of the search warrant based on two considerations. First, the investigating officers had complete and absolute discretion as to the scope of the search due to the broad language of the warrant. Second, the flexibility and ambiguity of this warrant's language could have been limited based on the information known by the officer at the time of its application.

> **a. The language of the warrant allows an unlimited search of the computer leaving complete and absolute discretion of the scope of the search to the investing officers.**

First, this search warrant was overly broad to the point that this warrant constituted a general warrant. There is a legal difference between general warrants and warrants that are simply overbroad. "A general warrant authorizes 'a general, exploratory rummaging in a person's belongings.'" United States v. Ninety-Two Thousand Four Hundred Twenty-Two

Dollars and Fifty-Seven  Cents, 307 F.3d 137 (3d. 2002). An overly broad warrant "describe[s] in both specific and inclusive generic terms what is to be seized," but it authorizes the seizure of items as to which there is no probable cause. This is not a case where the search warrant contained very general guidelines or items that would be searched on the computer, such as photographs, files, and downloads that could constitute an overly broad warrant. This is a case where investigators drafted a warrant that permitted the rummaging through the computer's entire contents.

Courts have long overruled broadly worded warrants, like this one, that provide no limits of the search. United States v. Lazar, 604 F.3d 230 (6th Cir. 2010) (warrants that provide no relevant dates for the documents to be seized when relevant dates were available was overly broad); Cassady v. Goering, 567 F.3d 628 (10th Cir. 2009) ("It is not enough that the warrant makes reference to a particular offense; the warrant must ensure that the search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."); United States v. Burgess, 576 F.3d 1078 (10th Cir. 2009) ("If the warrant is read to allow a search of all computer records without description or limitation it would not meet the Fourth Amendment's particularity requirement.); United States v. Galpin, 720 F.3d 436 (2d Cir. 2013); United States v. George, 975 F.2d 72 (2d Cir. 1992) ("Mere reference to 'evidence' of . . . general criminal activity provides no readily ascertainable guidelines for the executing officers as to what items to seize . . . [A]uthorization to search for 'evidence of a crime,' that is to say, any crime, is so broad as to constitute a general warrant."); United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty Cents, 307 F.3d 137 (3d Cir. 2002); United States v. Leary, 846 F.2d 592, 609 (10th Cir. 1988) (officers, with more than fifteen years of experience between the two, could not reasonably rely on a

warrant that gave unbridled discretion to search for whatever they wished); <u>United States v.</u> <u>Spilatro</u>, 800 F.2d 959 (9th Cir. 1986) (the only limitation to the scope of the warrant is reference to criminal statutes); <u>United States v. Roche</u>, 614 F.2d 6 (1st Cir. 1980). <u>See e.g.</u>, <u>United States</u> <u>of America v. Modi</u>, No. 1L01CR00050, 2002 WL 188327 (W.D. Va. Feb. 6, 2002) (holding that the defendants in a criminal case are using the discovery rule to get "'any and all documents, records, correspondence, emails and data' relating to a series of broad subjects, with the hope of uncovering something useful to their defense.").

In <u>United States v. Winn</u>, 79 F. Supp. 3d 904 (S.D. Ill. 2015), the court reviewed a warrant that allowed for the search of "any and all files" on a cell phone that "constitute[d] evidence of the offense" of Public Indecency. The Court determined that there was absolutely no probable cause to believe that *everything* that may be contained in the cell phone was criminal and evidence of a public indecency. Furthermore, the Court analyzed that validating this type of warrant would allow the searches and seizures of "every piece of data that could conceivably be found on the phone." <u>Id.</u> at 919. This type of unbridled power far exceeds an exhaustive search of a residence due to the amount of information a cellphone holds. <u>Id.</u>; <u>see generally</u> <u>Riley v.</u> <u>California</u>, 134 S. Ct. 2473 (2014).

> **b. A warrant's language cannot be so flexible to allow the search of the entire computer when information was known that would allow police officers to make the warrant more particular.**

The Government made a flexibility argument when discussing the phrase "any and all evidence of other crimes" that can equally apply to the first part of the warrant.[5]  A warrant's language can be flexible when there is a lack of information known to the officer that would

---

[5] The first part of the warrant states "any material associated with the homicide of Paul Dean Wilson Jr. stored internally on a Gateway laptop computer serial #NXY1UAA0032251 dark gray in color belonging to or used by James Timothy Cobb. Any and all evidence of any other crimes."

allow a more particular description. That is not the case here. Here, the Government cannot argue that this warrant was as sufficiently particularized as the investigation and factual development allowed.

The Tenth and Ninth Circuit Court of Appeals have spoken on this issue. In <u>United States v. Leary</u>, 846 F.2d 592, the Tenth Circuit Court of Appeals reviewed a similar issue with a warrant to seize the following property:

> Correspondence, Telex messages, contracts, invoices, purchase orders, shipping documents, payment records, export documents, packing slips, technical data, recorded notations, and other records and communications relating to the purchase, sale and illegal exportation of materials in violation of the Arms Export Control Act, 22 U.S.C. 2778, and the Export Administration Act of 1979, 50 U.S.C.App. 2410.

<u>Id.</u> at 595. The Court interpreted that this language limited the search to 1) any documents that fit within the exhaustive list of documents kept by the company, and 2) that the documents relate to the violation of a federal exports law. <u>Id.</u> at 601. The Court determined that "[a]s an irreducible minimum, a proper warrant must allow the executing officers to distinguish between items that may and may not be seized." The Court went on to discuss the general description, stating "[i]n addition to being overbroad on its face, the . . . warrant is flawed because information was available to the government to make the description of the items to be seized much more particular." <u>Id.</u> at 604. The Court found that because the combined language and failure to provide facts known to investigating officers in the warrant, the warrant was facially overbroad.

The Ninth Circuit Court of Appeals has also reviewed the issue with a similarly broad warrant. The warrant allowed the seizure of:

> notebooks, notes, documents, address books, and other records; safe deposit box keys, cash, and other assets; photographs, equipment including electronic scanning devices, and other items and paraphernalia, which are evidence of violations of 18 U.S.C. 1084, 1952, 892–894, 371, 1503, 1511, 2314, 2315, 1962–1963, and which are or may be: (1) property that constitutes evidence of the

>commission of a criminal offense; or (2) contraband, the fruits of crime, or things
>otherwise criminally possessed; or (3) property designed or intended for use or
>which is or has been used as the means of committing a criminal offense.

Spilotro, 800 F.2d 959, 962 (9th Cir. 1986). The Ninth Circuit found that "the government could have narrowed most of the descriptions in the warrant either by describing in great detail the items one commonly expects to find on premises used for the criminal activities in question, or, at the very least, by describing the criminal activities themselves rather than simply referring to the statute believed to have been violated. Id. at 964. The Ninth Circuit also noted the importance of the information available at the time of the warrant's issuance. Id. at 965-66 (citing United States v. Cardwell, 680 F.2d 75 (9th Cir. 1982)).

In this case, the lack of any instruction as to what can be searched and seized is not reflective of flexibility, but rather the insufficiency of a warrant's requirements. Investigating officers had the ability to limit the scope of the warrant and failed to do so. The probable cause authorized the search for evidence regarding Mr. Wilson's use of the computer because Defendant allegedly wanted the computer cleaned as a result of his use which was at the time an ongoing theory of motive. While search warrants can, in certain circumstances, be broadly written, the amount of factual investigation regarding the computer that occurred prior to the issuance of the search warrant negates any argument that the Government makes in this regard.

In this instance, the investigating officers knew that there were three different explanations as to the motive of the altercation and that Mr. Wilson's use of the computer prior to the altercation was discussed by Defendant and his parents during the jail calls. See United States v. Santarelli, 778 F.2d 609, 614 (11th Cir. 1985) (broad terms are allowed only "when the description is as specific as the circumstances and the nature of the activity under investigation permit"); United States v. Strand, 761 F.2d 449, 453 (8th Cir. 1985) ("degree of specificity

required necessarily depends upon the circumstances of each particular case"); <u>United States v.</u>
<u>Fuccillo</u>, 808 F.2d 173, 176 (1st Cir.). The officer testified that he was looking for evidence of
motive that could help justify the First Degree Murder charge and that he wanted to look at
"photographs, files, searches about suffocations, and emails." Sgt. Alkire also knew that Mr.
Wilson had allegedly put something on the computer in the days prior to the altercation. All of
this information could have been used to limit the search. The search warrant could have been
limited to the files that were testified to by Sgt. Alkire at suppression hearing—internet searches
about suffocations and files—with the addition of a time limit— that have been accessed and/or
added within the previous two weeks (or some time limit).

The undersigned also considered the following:  How can an investigating officer search
such technology when very "few people keep documents of their criminal transactions in a folder
marked 'crime records?'" <u>United States v. Gray</u>, 78 F.2d 524, 528 (E.D. Va. 1999). This issue
has been addressed by the Fourth Circuit Court of Appeals in <u> Arkansas Chronicle v. Murphy</u>,
183 Fed. App'x 300 (4th Cir. 2006)[6] and <u>United States v. Williams</u>, 592 F.3d 511 (4th Cir.
2010).

 In <u>Arkansas Chronicle</u>, the Court reviewed the sufficiency of a search warrant for the
following items:

> any and all computer equipment, hard disk drives, compact disks, floppy disks,
> magnetic tapes or other magnetic or optical media capable of storing information
> in an electronic, magnetic, or optical format. This information may include, but it
> is not limited to letters, correspondence, memoranda, journals, electronic mail,
> image files, database files, deleted files, partial files or other types of files found
> in the media or computer.

---

[6] While this case is a civil matter brought under 42 U.S.C. § 1983, the underlying matter triggering the suit was a
criminal matter involving search warrants of the home of a suspected bomber and as such reviews the sufficiency of
warrants under the Fourth Amendment.

Id. at 303-04. The warrant, however, was specifically issued to search for a video that was allegedly in the defendant's possession. The defendant argued that because the search warrant was seeking to seize a video, the search warrant itself should be limited in nature to "only 'image' files such as .jpg, .tip, .bmp, or .gif files could be searched." Id. at 206. The Court warned that because the video that was being sought was in electronic form, the video file could be easily disguised and unrecognizable to the executing officer. "It is possible to embed an electronic image into a word processing file or convert the image into .pdf format and still have the document labeled as a .wpd, .doc, or .pdf file, as opposed to .jpg, .gif, .tif, or .bmp." Id. at 306. The Court's concern is that certain documents can be concealed as a different type of file or may be presented in different formats, so broader searches may be reasonable.

This consideration does not negate the initial particularity requirement. This only allows for an expansive and broader search warrant when a known file or document could masquerade as another. This warrant did not even mention what document, file, or information for which law enforcement was searching. As such, a broadly written warrant would not be appropriate under these circumstances.

Another consideration of searching electronic devices is the inability to comprehend what a file is or contains prior to opening it. The Fourth Circuit in United States v. Williams, 592 F.3d 511 (4th Cir. 2010) reviewed such issues.[7] In Williams, the Fourth Circuit reviewed a warrant issued to seize:

> Any and all computer systems and digital storage media, videotapes, videotape recorders, documents, photographs, and Instrumentalities indicat[ive] of the offense of § 18.2-152.7:1 Harrassment by Computer and § 18.2-60 Threats of death or bodily injury to a person or member of his family; threats to commit serious bodily harm to persons on school property, Code of Virginia (as amended).

---

[7] While the Court reviewed the discovery of a separate crime that was held to have been discovered within the scope of the warrant issued, the sufficiency of the warrant with regards to particularity was not reviewed.

Id. at 516. During the seizure of the items, investigating officers found a DVD which contained child pornography. The defendant challenged the warrant arguing that the discovery of child pornography did not fall within the scope of the warrant. The Court determined, even if the discovery of child pornography was not within the scope of the first warrant, the child pornography was discovered under the plain view doctrine—which allows to some extent a cursory review of innocuous documents. The Court stated that "[w]hen a search requires review of a large collection of items such as papers, 'it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.'" Id. at 519-20.

The Court determined that in Williams, "the warrant impliedly authorized officers to open each file on the computer and view its contents, at least cursorily, to determine whether the file fell within the scope of the warrant's authorization—i.e., whether it related to the designated Virginia crimes of making threats or computer harassment." Id. at 521-22. A search, like this one, "could not be limited to reviewing only the files' designation of labeling, because the designation or labeling of files on a computer can easily be manipulated to hide their substance." Id. at 522. The Court stated that "[o]nce it is accepted that a computer search must, by implication, authorize at least a cursory review of each file on the computer, then the criteria for applying to plain-view exception are readily satisfied." Id.

Discovery of any crimes within the scope of the warrant is then discovered under the plain-view doctrine. Under the plain view exception, investigating officers are able to legally seize evidence when the officer is 1) "lawfully present at the place from which the evidence can be plainly viewed;" 2) the officer has "a lawful right of access to the object itself;" and 3) "the object's 'incriminating character [is] . . . immediately apparent." Williams, 592 F.3d at 521.

If the second search warrant (ECF No. 19-2) had been written to satisfy the particularity requirements of the warrant, the discovery of the child pornography may have fallen under the plain view exception. But see United States v. Burgess, 576 F.3d 1078 (10th Cir. 2009) (possible criminal violations discovered outside the scope of a warrant required a second warrant); United States v. Mann, 592 F.3d 779 (7th Cir. 2010) (failing to stop a search after the discovery of child pornography during a search for evidence of another crime is "troubling"). This cursory review and plain view exception, together, will only justify the seizure of the child pornography in the event 1) the warrant impliedly authorizes the cursory review of every file on the computer, and 2) the child pornography was found within the scope of the search warrant's authority.

The fact that certain warrants impliedly allow a cursory review of documents does not negate the particularity requirement. The Government, while not explicitly arguing, is justifying the seizure of the child pornography under the plain view exception. Had the warrant been a valid warrant, the Government's argument may have succeeded. This is not a cursory review of the documents and files to determine whether they fall within the scope of a warrant; this was rummaging to see what was on the computer. While there may be instances that would allow a cursory review of documents on a computer, a valid warrant must authorize the cursory review prior to opening every document or file on a computer.[8]

---

[8] With the above discussion of cursory reviews of all files, the undersigned ruled out that this information could have been admitted through either the independent source and the inevitable discovery doctrines. "The independent source doctrine allows for trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016). This does not apply here, or at least not based on the record, because all of the information regarding the discovery of the child pornography stemmed from its discovery on Defendant's computer.

Second, when the prosecution can demonstrate by a preponderance of the evidence that such information that would normally be suppressed, "would have been discovered by lawful means then the deterrence rationale has so little basis that the evidence should be received," the inevitable discovery exception applies. ," the inevitable discovery exception applies. Nix v. Williams, 467 U.S. 431 (1984). This exception does not apply, because even if there had been a lawfully issued search warrant, the undersigned would only be speculating as to what information would have been collected. The government has provided no such argument, as it was not necessary during the initial pleadings, to  the undersigned.

If this warrant is upheld, the entire computer, with no exceptions, would have been within the scope of the search. Law enforcement would legally be allowed to rummage through document after document, picture after picture until evidence of criminal behavior has been discovered. See United States v. Comprehensive Drug Testing Inc., 612 F.3dd 1162 (9th Cir. 2010) (A "serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant" exists.); United States v. Galpin, 720 F.3d 436 (2d Cir. 2013) ("Once the government has obtained authorization to search the hard drive, the government may claim that the contents of every file it chose to open were in plain view and, therefore, admissible even if they implicate the defendant in a crime not contemplated by the warrant."). Rummaging is incomparable to cursory review. The main difference is that in a cursory review, the officer knows what he is looking for and is using that review to determine whether the file fits within the warrant's scope. In this instance, the investigating officers have no guidelines as to for what they are searching. It is nearly impossible for the officers to open a file and understand it to be evidence of the homicide, without much further investigation.

Furthermore, there was no additional information contained in the accompanying affidavit that in consideration with the information in the warrant, would make the warrant more particular. See Owen v. Lott, 372 F.3d 267 (4th Cir. 2004). The government argues that the affidavit provides sufficient information describing the altercation, death, and one comment regarding the computer. The only information in the search warrant that references the computer was one sentence which states that Defendant asked his father to clean up his computer. The information that was necessary and pertinent to the particularity requirement was the information investigating officers knew about the computer and its relation to the crime. This and only this

information would particularize the warrant to the point that the attached affidavit could have saved the warrant.

Accordingly, the undersigned finds that the warrant lacks sufficient particularity and does not meet the basic search warrant requirements rendering the warrant invalid.

### 3. The phrase "any and all evidence of other crimes" does not affect the particularity of the warrant in this instance.

Defendant alleges in its *Supplemental Memorandum of Law* that the phrase "[a]ny and all evidence of any other crimes" contained at the end of the warrant is "unconstitutionally broad in scope" and argues that the phrase "impermissibly leaves all of Mr. Cobb's personal information contained in the laptop at the unfettered discretion of the State." (ECF No. 18, at 2). Furthermore, Defendant argued that this language created a generalizing scope that limited the nature of the preceding language.

Extraneous language at the end of warrants have been reviewed and determined, in certain circumstances, to have no effect on a preceding list of items to be searched or seized that is sufficiently particularized. Andresen v. Maryland, 427 U.S. 463 (1976). In Andresen, the Supreme Court of the United States reviewed the sufficiency of a warrant that provided an exhaustive list of items to be seized, but added the phrase "together with other fruits, instrumentalities and evidence of crime at this (time) unknown" to the end of the sentence. Id. at 479. The defendant argued that this language made the warrant a general one and "permits the search for and seizure of any evidence of any crime." Id. The Court determined that the term "'crime' in the warrants refers only to the crime of false pretenses with respect to the sale of [the lot]. . . . The warrants, accordingly, did not authorize the executing officers to conduct a search for evidence of other crimes but only to search for and seize evidence relevant to the crime of false pretenses and [the lot]." Id.

In <u>United States v. Jacob</u>, 657 F.2d 49, 51 (4th Cir. 1981), the Court analyzed an extraneous phrase that was contained in a search warrant application that followed a list of documents to be searched that limited the scope of the warrant to a particular time and to particular persons to which the documents pertained. The <u>Jacob</u>'s Court cited to the First Circuit Court of Appeals case: <u>United States v. Abrams</u>. In <u>United States v. Abrams</u>, 615 F.2d 541 (1st Cir. 1980), the First Circuit Court of Appeals found that <u>Andresen</u> established that general phrases at the end of search warrants would not defeat any particularity requirement in the actual body of the warrant. <u>Id.</u> at 547.

The <u>Jacob</u> Court, in light of both <u>Andresen</u> and <u>Abrams</u>, stated that this type of particularity "will not be defeated by ambiguous conclusory language. While a sufficiently particular qualifying phrase may have the effect of bringing an otherwise 'general' warrant within the constitutional standard, a defective qualifying phrase will not defeat a warrant which is otherwise sufficiently specific." <u>Jacob</u>, 657 F.2d at 52. The Court further stated that this interpretation of <u>Andresen</u> is consistent with Fourth Circuit holdings and will "seek[] to avoid the suppression of evidence seized pursuant to a warrant because of 'hypertechnical' errors." The <u>Jacob</u> Court reasoned that due to the complexity of the factual scenario presented in that case, the warrant was sufficiently particularized given the circumstances and that this phrase was "merely superfluous and falls within the 'practical margin of flexibility' afforded warrants in cases of this type." <u>Jacob</u>, 657 F.2d at 52.

As of now, generalizing phrases contained at the end of warrants serve as a "catch-all" and do not authorize the expansion of a search when the actual search warrant is sufficiently particularized. In the evaluation of the phrase, there are two issues that have not been addressed. First, unlike the cases cited by either party, this phrase specifically states "other crimes." While

the Supreme Court interpreted a generalizing phrase similar to this one, this difference is important because this phrase cannot be attributed to the crime specified in the warrant, i.e. murder. This phrase specifically states that it allows the search of evidence of any crime other *than* murder.

The second differing characteristic concerning of this phrase is that the preceding body of the warrant is not particular as seen in <u>Andresen</u>, <u>Jacob</u>, and <u>Abrams</u>. As discussed above, the warrant allows a search of the entire computer with no restrictions. Whether this phrase negates the particularity of a general warrant is an issue that has not been adequately examined by any Court based upon our review. However, the Northern District of West Virginia has already determined that this phrase is overly broad and that it "could be seen as authorizing a general exploratory rummaging in a person's belongings." <u>United States v. Lipscomb</u>, No. 2:12cr11, 2012 WL 2590475, (N.D.W. Va. 2012) (by itself, the phrase "any and all evidence" is overly broad and could be seen as authorizing a general exploratory rummaging in a person's belongings).

Together with an already general allowance to search "any material associated with" the homicide of Mr. Wilson and the broad nature of the phrase, the undersigned finds that this phrase could lead police officers to believe that the warrant permits the search for any evidence of any crime other than the one described in the warrant. Whether this phrase may negate any particularity, when the preceding language in the warrant is not sufficiently particular, has not been reviewed by any court. However, due to the broad language of <u>this</u> warrant, this phrase does not affect the absence of particularity. Accordingly, the undersigned finds that the phrase "any and all evidence of any other crime" did not affect the absence particularity of <u>this</u> warrant because the preceding language lacked the required particularity.

### C. The <u>Leon</u> Good Faith Exception

Defendant also argues that the good-faith exception does not apply because an objectively reasonable officer would have known that this warrant does not satisfy the warrant requirements. The Government argued that the good-faith exception applies because "the officer provided great detail that addressed the identity of the individuals involved in the altercation; the physical means by which Mr. Cobb caused Mr. Wilson's death; the date, time and location of the altercation; and the identity of the two eye witnesses." (ECF No. 19, at 14). The Government's argument continued, stating that the warrant may be lacking in probable cause, but "it certainly cannot be fairly characterized as 'so lacking indicia of probable cause' as to make it unreasonable." <u>Id.</u>

When the Fourth Amendment has been violated, sometimes the exclusionary rule prevents fruits of the violation from being admitted at trial. The "exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.'" <u>Herring v. United States</u>, 555 U.S. 140, 141 (2009). The exclusionary rule is not automatically triggered and is also not a *necessary* consequence of violations of the Fourth Amendment. <u>Id.</u> at 147. Moreover, the exclusionary rule is intended to deter 1) deliberate misconduct, 2) reckless misconduct, 3) grossly negligent conduct, or 4) recurring or systemic negligence. <u>Id.</u>

In <u>United States v. Leon</u>, "the Supreme Court held that a court should not suppress the fruits of a search conducted pursuant to a 'subsequently invalidated' warrant unless 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" <u>McKenzie-Gude</u>, 671 F.3d at 458 (quoting <u>Leon</u>, 468 U.S. 897, 922 n.23 (1984)).

The substantial social costs exacted by the exclusionary rule for the vindication of Fourth Amendment rights have long been a source of concern. "Our cases have

> consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury." United States v. Payner, 447 U.S. 727, 734, 100 S. Ct. 2439, 2445, 65 L.Ed.2d 468 (1980). An objectionable collateral consequence of this interference with the criminal justice system's truth-finding function is that some guilty defendants may go free or receive reduced sentences as a result of favorable plea bargains. Particularly when law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system.

Leon, 468 U.S. at 907.

In determining whether the good-faith exception applies, the reviewing court "'is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" United States v. McKenzie-Gude, 671 F.3d 452, 459 (4th Cir. 2011). As a result, the reviewing court is allowed to "look outside the four corners of a deficient affidavit when determining . . . whether an officer's reliance on the issuing warrant was objectively reasonable." Id.

The following are the circumstances that the good-faith exception that a police officer could not have been said to have objectively relied on the warrant.

> (1) "the magistrate ... was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth";
> (2) the magistrate acted as a rubber stamp for the officers and so "wholly abandoned" his detached and neutral "judicial role";
> (3) "an affidavit [is] so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or
> (4) "a warrant [is] so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

United States v. Bynum, 293 F.3d 192, 195 (4th Cir. 2002) (quoting Leon, 468 U.S. at 923).

The reviewing court can also consider whether the investigating officer was also relying on "uncontroverted facts known to them but inadvertently not presented to the magistrate." McKenzie-Gude, 671 F.3d at 460; see also United States v. Marion, 238 F.3d 965, 969 (8th Cir. 2001); United States v. Dickerson, 975 F.2d 1245 (7th Cir. 1992); United States v. Taxacher, 902 F.2d 867 (11th Cir. 1990). The Fourth Circuit Court of Appeals reasoned that "[r]efusing to consider such information risks the anomalous result of suppressing evidence 'obtained pursuant to a warrant supported by the affidavit of an officer, who, in fact, possesses probable cause, but inadvertently omits some information from his affidavit." McKenzie-Gude, 671 F.3d at 460 (quoting Bynum, 293 F.3d at 1999). The reviewing court will also take into consideration the police officer's knowledge and experience. Herring, 555 U.S. at 703. However, the Court recognizes that when considering these uncontroverted facts known to the officer, the court cannot, at the same time, consider the "inquiry into the subjective *beliefs* of law enforcement officers." Leon, 468 U.S. at 922.

Courts must also balance the costs suppression of evidence due to a facially deficient warrant against the social costs of correcting the deficiency. The exclusionary rule provides a "costly toll" on law enforcement and criminal justice objectives, which establishes a "high obstacle" for "those urging [its] application." Herring, 555 U.S. at 141. The benefits of the deterrence must outweigh the costs of suppression. Id. The reviewing court must also assess the "flagrancy of the police misconduct." Id. at 142. The Court elaborated stating that "evidence should be suppressed 'only if it can be said that the law enforcement office had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" Id. This good-faith exception, however, "is not a magic lamp for police officer to

rub whenever they find themselves in trouble." United States v. Reilley, 76 F.3d 1271 (2d Cir. 1996).

Courts have determined that good-faith does not save an otherwise invalid warrant when a reasonably trained officer would have known that the warrant was facially invalid. Lazar, 604 F.3d 230 (the Court suppressed non-patient related file evidence because the government did not specify exactly what it was seeking, rather used broad descriptive words that did not reference specific patients, transactions, or times when available); Leary, 846 F.2d 592 ("A reasonably well-trained officer should know that a warrant must provide guidelines for determining what evidence may be seized. A warrant that directs an officer to seize records "relating to" violations of the federal export law offers no such guidelines."); Fuccillo, 808 F.2d 173 (investigating agents did not have any "physical criteria or detailed description in the warrant to enable them to determine what they might lawfully seize."); Spilotro, 800 F.2d 959 (an investigating officer could not rely on an overly broad warrants that authorized the search for evidence of a violation of thirteen broad criminal statutes)

Only one[9] of the exceptions presented in Leon need to apply in order to determine that the objective good-faith of an officer was not sufficient to save an otherwise invalid search warrant. Here, the undersigned analyzes whether "a warrant [is] so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing

---

[9] The undersigned does not review whether the good-faith exception with regard to the third consideration as to lack of probable cause because probable cause existed. However, in the event that the District Court were to find that the warrant was not based on probable cause, the undersigned recommends that the warrant not be invalidated because an objectively reasonable officer would believe that there was sufficient probable cause for the warrant to issue. In the good-faith determination, uncontroverted evidence known to an officer can be considered in the analysis to determine whether the search warrant lacked sufficient probable cause that no reasonable officer would find that the warrant was valid. Here, the investigating officers had more information than was presented in the warrant itself. The officers knew that there were three different explanations presented to the police regarding why the altercation occurred; that Mr. Wilson allegedly put "shit" on Defendant's computer; and Defendant wanted his father to clean up his computer. The undersigned recommends to the District Court that the good-faith exception saves any question of probable cause.

officers cannot reasonably presume it to be valid." The consideration that the police officer obtained a search warrant is prima facie evidence that the search was objectively reasonable, thus, the burden shifts to Defendant to show otherwise. The subjective beliefs of Sgt. Alkire aside, an objectively reasonable police officer would have interpreted the warrant as it stood allowed a search allowed the search of every single piece of information on the computer when probable cause did not allow such an inquiry.

While the Fourth Circuit Court of Appeals has not reviewed the good-faith warrant exception under this type of circumstance—an overly broad warrant—other Circuits have analyzed this issue. In Leary the Court reviewed warrant that lack particularity and considered "all of the circumstances," and "assume[d] that the executing "officers have a reasonable knowledge of what the law prohibits." Leary,  846 F.2d at 607. The Tenth Circuit found that "the warrant was so facially deficient in its description of the items to be seized that the executing officers could not reasonably rely on it," which was "reinforced by the government's conduct and the circumstances of the search." Id. The Tenth Circuit also relied on in its consideration several other Circuit decisions holding the same, including United States v. Crozier, 777 F.2d 1376(9th Cir. 1985) ("the government executed a warrant 'that did not describe any particular property to be seized; it merely authorized the seizure of "Material evidence in violation 21 USC 841, 846); United States v. Spilotro, 800 F.2d 959 (9th Cir. 1986) (good-faith exception does not apply to facially over broad warrants); United States v. Fuccillo, 808 F.2d 173, 176-77 (1st Cir. 1987) ("[T]he 'executing agents . . . had no "physical criteria or detailed description in the warrant to enable them to determine what they might lawfully seize.'"").

This is not a case where the only information that was known to investigating officers was that the computer was mentioned during a jail call and there was suspicion that this

33

computer contained evidence. Sgt. Alkire testified that there were statements made to lead the officers to believe that there was "something important on the computer that had relevance to what had happened." Sgt. Alkire did not know what this "something" was and stated it may have been evidence of motive or pre-mediation. At the time of the drafting of the second warrant and execution, the investigating officers knew that there was an altercation between cousins that led to the death of Mr. Wilson, after Mr. Wilson had allegedly recently "put shit" on Defendant's computer (as testified to by Sgt. Alkire at the hearing). Sgt. Alkire knew that there three different reasons behind the altercation had been given to the investigating officers and that the second degree murder charge had been increased to first degree murder based on the two 911 calls. Sgt. Alkire also testified that he knew what information he was seeking, which included evidence of motive and premeditation, but yet that information.

Sgt. Alkire did not provide an explanation to why this information was not contained in the search warrant. The search warrant could have been sufficiently particularized with the above known facts, limiting the search. United States v. Buck, 813 F.2d 588 (2d Cir. 1987) ("While it can safely be said that the police here performed reasonably under the circumstances and collected all the 'descriptive facts' they could . . . they clearly did not insure that all known facts were included in the warrant."). In this case, an objectively reasonable officer would have known that this search warrant was not valid because it failed to provide any limitations to narrow the scope of the search.

Furthermore, the undersigned considers the investigating officer's conduct as further justification for its lack of good-faith finding. See United States v. Leary, 846 F.2d 592 (10th Cir. 1988) (taking into consideration government's conduct and the circumstances of the search). The assisting investigating officer who searched the computer had no previous experience

searching computers, yet was in charge of executing this extremely broad search warrant to look for "any material associated with the homicide." Sgt. Alkire also testified that the state computer lab in Morgantown, West Virginia had the ability to search the computer, and determine what had been deleted or downloaded, etc. In fact, Sgt. Alkire testified at trial that "the computer was going to go to the lab, and it was going to be months before we knew what it was, so we felt it was important enough that we go ahead and just take a quick look in it and then send it to the lab."

The investigating officer had no plan of execution to search the computer. Sgt. Alkire began his search by randomly opening files on the p.c. He stated that he wanted to review photographs, files, searches, and any reference to suffocation. Sgt. Alkire testified that "he pulled up a bunch of files and found a bunch of pictures of underage girls in various states of undress and sexual acts and that was it." The undersigned believes that no objectively reasonable officer would believe that he had the authority to search the entirety of a computer for "evidence," without further explanation as for what was being searched, what constituted said "evidence," without any plan as to how one would conduct the search, and that randomly opening files would fall within the authority of the search warrant. Especially in light of the fact that he had never conducted a search before and that an expert was available to them to do so.

While the exclusionary rule should be applied only for the most egregious of cases, this search warrant is among the broadest and most general warrants that have been reviewed by the undersigned. The judicial stamp of approval of this type of warrant would validate a general search of equipment that stores the most personal and private information in a person's life, without delineating any limits. A validation of this type of warrant sets precedent for further search warrants that: when an investigation has uncovered relevant and pertinent information,

police officers through negligent drafting, can disregard this information to the point of allowing a search for information for which there was no probable cause.

## III.     RECOMMENDATION

Accordingly, the undersigned **RECOMMENDS** that the District Court **GRANT** the Motion with regard to the September 23, 2014 search warrant (ECF No. 19-2) and **DENY** the Motion to Suppress in regard to the September 16, 2014 search warrant (ECF No. 19-1).

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Entered August 24, 2018

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE